## Statement of Facts

1. On April 5, 2019, at approximately 0530 hours, the Metropolitan Police Department ("MPD")/Federal Bureau of Investigation ("FBI") Child Exploitation and Human Trafficking Task Force ("CEHTTF") was notified by Second District Patrol that they had stopped a 17-year-old female who was reporting that she working for a pimp[1], later identified as Rodregiz Antwon Cole (herein "COLE"). The manager of Unique Hotels, 1011 K Street, Northwest, Washington, D.C. noticed the complainant was walking in front of the hotel crying and asked if she needed any help. The complainant stated that she wanted to get away from her pimp and the police were called.

2. The MPD/FBI CEHTTF was in the area and responded to 1011 K Street, Northwest, Washington, D.C. and interviewed the complainant. The complainant reported that she was from Charlotte, North Carolina, and had been recently traveling with her boyfriend to Virginia. They got into an argument about money and he left her in Petersburg, Virginia. The complainant said that she was then contacted by COLE, whom she only referred to as "daddy", from her "skipthegames.com" online sexual solicitation advertisement. The complainant stated that COLE was in Richmond, Virginia and wanted the complainant to work for him by engaging in commercial sex. The complainant told COLE that she was 17 years old, and COLE initially did not want the complainant to work for him because of her age. The complainant advised that COLE later agreed to allow her to work for him and then took her to his home in Baltimore, Maryland. The complainant reported that there were two other adult females who worked for COLE as commercial sex workers.

---

[1] "Pimp" is a term used to describe a person who causes another to engage in commercial sex for his/her benefit. In this instance, due to the age of the complainant, pimp is synonymous with trafficker.

3.     The complainant disclosed that on April 4, 2019, COLE drove her from his Baltimore, Maryland home into the District of Columbia and had her prostitute on "the Track," a well-known area for commercial sex in the areas of 1000-1200 blocks of K, L, and M Streets, Northwest, Washington, D.C. The complainant stated she had performed approximately 6 commercial sex acts and made approximately $600. The complainant stated she gave all her money to COLE.

4.     On April 5, 2019, COLE drove the complainant again from his Baltimore, Maryland home into the District of Columbia and had her prostitute on the Track. The complainant did not make any "dates"[2] and got lost from the other adults that worked for COLE. The complainant said she was noticed by the manager of the hotel and made the report. The complainant said that COLE had driven her from Baltimore to D.C. in his orange-colored Ford Mustang.

5.     A lookout for the vehicle described by the complainant was voiced over the Second District Radio, and an orange-colored Ford Mustang, bearing South Carolina tags QNC943, was stopped in the 1100 block of K Street, Northwest, Washington, D.C. COLE was located in the driver seat of the vehicle and another male was in the passenger seat. Photographs of both males were shown to the complainant and she identified COLE as her pimp. COLE was placed under arrest for Sex Trafficking of a Minor, in violation of 18 U.S.C. 1591(a).

6.     The complainant reported that she had also communicated with COLE via his Instagram account, don.byti.balla. The complainant could not remember the password to her Instagram account, and had recently lost her cellphone with that information. It was observed that

---

[2] "Dates" is a slang term to describe an encounter in which a commercial sex worker engages in sexual acts in exchange for money from a client.

the complainant's Instagram account was followed by don.byti.balla.

7. A custodial interview was conducted with COLE, and he stated that Instagram account don.byti.balla was his account. COLE denied that he was a pimp and made no admissions regarding the complainant working for him.

8. A follow-up interview was conducted with the complainant once she was taken to a safe location, and the complainant provided additional information. She indicated that when COLE picked her up in Virginia several days before, he had obtained a rental car to drive her back to his home in Baltimore, Maryland. She stated that along the way, COLE picked up the other two adult females working for him, whom the complainant identified by their prostitute names, and that the two others followed COLE and the complainant back to Baltimore in COLE's orange Mustang he had been driving. The complainant stated that during the drive to Baltimore, COLE told her the rules she should abide by while working for him as a commercial sex worker. She also stated that COLE indicated he was concerned about her age given that she was seventeen and he knew he could get in trouble for selling a minor. When COLE arrived at his home in Baltimore, the complainant stated he let himself into the home with a key and that she followed him inside. The complainant stayed with COLE in his Baltimore home for several days.

9. The complainant also provided more information about COLE's residence in Baltimore, Maryland. The complainant did not know the precise address, but described the residence as a brick row home located in the middle of the block. The complainant stated there were a couple of steps to walk up to the front door. The complainant advised that COLE had other vehicles in addition to his Mustang, to include a BMW that he kept under a car cover that was parked on the opposite side of street as the house. The complainant indicated that COLE also had a gray Lexus, which he parked on the street on the same side as his house. The complainant stated

that the only thing between the house and the street was a sidewalk. She also described the house as being two stories. She described the interior has having three bedrooms and as being occupied by only COLE and the other two adult women who performed commercial sex acts for COLE's benefit, each of whom had her own room. The complainant stayed in a bedroom with one of the adult women for the nights she stayed in the home. She described each of these two rooms as filled with "heels" and clothes that were used by the two women when they work the Track. The complainant also stated that her purse, which she left behind on April 5, 2019, is located in one of the bedrooms belonging to the adult woman in whose room the complainant stayed. The complainant indicated that contained inside the purse were an identification card with her name on it, a prescription medication bottle, and a recent sonogram of her child, as the complainant was several months pregnant.

10. The complainant reported that she observed COLE with handguns, which he usually carriers in his waistband or in the hood of his car. The complainant observed that COLE has other firearms in his residence, and has seen what she described as "small" handguns in his bedroom in his residence.

11. A search through various police databases found COLE to be associated with an address of ⬛⬛⬛⬛, Baltimore, Maryland. The exterior of that residence matches the description provided by the complainant. A member of the MPD/FBI Child Exploitation Task Force conducted surveillance on the address of the ⬛⬛⬛⬛, Baltimore, Maryland on April 8, 2019, and the covered BMW was parked across the street and a gray Lexus was parked out front, as described by the complainant.

12. On April 10, 2019, a search warrant for ⬛⬛⬛⬛, Baltimore, Maryland was issued by the United States District Court of Baltimore, Maryland. On the same date, a witness

(herein "WITNESS 1"), contacted your affiant and said she was looking for her Ford Mustang. WITNESS 1 advised that she had spoken with the MPD Third District precinct to obtain your affiant's information. The Ford Mustang, grey Lexus, and a Jaguar, all used by COLE, were registered to WITNESS 1. Your affiant advised WITNESS 1 the Ford Mustang was seized as evidence and asked her to agree to an interview.

13. On April 10, 2019, WITNESS 1 was interviewed by members of CEHTTF and stated that she had heard that COLE was arrested. WITNESS 1 advised she had come up from South Carolina to Washington, D.C. that same day and was trying to get her property back. WITNESS 1 denied that she had any knowledge COLE being a pimp or what he was doing in the Washington, D.C. area.

14. On April 11, 2019, at approximately 0730 hours, members of CEHTTF executed the search warrant at                          , Baltimore, Maryland. Upon arrival to the location, WITNESS 1 was observed outside and standing by a parked vehicle, a Toyota Avalon bearing Maryland tags XXXXXXX. WITNESS 1 stated that she had just arrived that morning and that "Lumberjack", later identified as LAWRENCE GAMBLE (herein "the DEFENDANT"), with a date of birth of XX/XX/XXXX, had driven her to the location. WITNESS 1 informed agents with the CEHTTF that she had removed documents and items from COLE's residence and they were packed in bags inside of the Toyota Avalon. WITNESS 1 said that the DEFENDANT was assisting in removing COLE's items from the house.

15. The DEFENDANT, who was driving the Toyota Avalon containing the evidence, and whose child was in the back seat, gave consent to members of the CEHTTF to search the Toyota Avalon. Evidence critical to the investigation involving Sex Trafficking of a Minor by COLE was found packed in the bags. Such evidence included pimp-related clothing (including a

jacket depicted in a pimp recruitment video posted on Instagram by COLE); a "pimp cup;" a "Pimp of the Year" trophy for the year 2018 awarded to "Don Byti Balla," COLE's pimp name; multiple credit cards; and various documents associated with COLE. The vehicle tags to the grey Lexus that was parked outside of COLE's home and registered to WITNESS 1 were in the bags packed inside of the DEFENDANT's car. The sonogram picture of the complainant, which documented her name and date of birth, were located in the center console of the DEFENDANT's vehicle.

16. It was learned through interviews with COLE's mother and his wife, both of whom where located at                        , Baltimore, Maryland at the execution of the search warrant that WITNESS 1 had been at the residence since Tuesday, April 9, 2019. COLE's mother claimed that she was present at COLE's residence because when she found out her son had been arrested, she decided to come to his residence to make sure no one "ransacked" his house. COLE's mother stated that when she arrived days earlier, the back door was open and it appeared as if someone had "ransacked" it.

17. On April 11, 2019, the DEFENDANT was briefly interviewed on-scene by members of the CEHTTF. The DEFENDANT claimed that WITNESS 1 had just called him that morning to get a ride to the train station. The DEFENDANT believed WITNESS 1 had been up at the house since Tuesday but denied that he had any part of putting COLE's items in his car. The DEFENDANT was questioned about the complainant's sonogram found in the center console of his vehicle, but said he had no knowledge of it. The DEFENDANT said that he believed WITNESS 1 was jealous because it appeared that COLE had gotten one of his other girls pregnant. The DEFENDANT said he knows COLE from school when they were both in South Carolina and sees him time to time but they "ain't no best friends type." The DEFENDANT denied having knowledge of COLE being a pimp.

18.     On April 11, 2019, several interviews were conducted with WITNESS 1, who stated that she actually came to the Washington, D.C./Baltimore area on April 9, 2019. WITNESS 1 admitted that she purposely did not tell members of the CEHTTF this information when she was interviewed on the previous day. WITNESS 1 stated that COLE called her from jail and instructed her to remove his "toys," which was how he referred to his firearms, and other important "stuff" from his residence. WITNESS 1 informed investigators that COLE told WITNESS 1 to have the DEFENDANT help with getting the guns and other items removed from the house. WITNESS 1 provided a message she sent to the DEFENDANT on April 7, 2019, at approximately 1330 hours, via Facebook messenger. The message said, "He just called and said you and Jack get the important shit. We all know how he is about his things." Via Facebook messenger, the DEFENDANT asked for WITNESS 1's phone number, which she provided. WITNESS 1 and the DEFENDANT then had several phone conversations from April 7, 2019, to April 11, 2019. WITNESS 1 stated to investigators that the DEFENDANT had already gone to COLE's house, which according to WITNESS 1 was actually leased to the DEFENDANT, and started packing up COLE's items before she had arrived.

19.     WITNESS 1 was questioned about the complainant's sonogram picture, and she stated that the DEFENDANT mentioned the sonogram to her first. The DEFENDANT said he had gone to the house, found that the jewelry was gone, but that he was looking for the "sonogram." WITNESS 1 stated that she thought the DEFENDANT was looking for the sonogram because it had one "the girl's" name on it, and the DEFENDANT wanted to find the girl and see if she had taken COLE's jewelry. WITNESS 1 said she later asked COLE when he called from jail about the "sonogram," and COLE claimed not to know anything about it. WITNESS 1 said she never saw the sonogram picture and had no knowledge about it being in the center console of the

DEFENDANT's Toyota Avalon. WITNESS 1 said that COLE and the DEFENDANT were best friends and that she was not sure if they discussed anything about the sonogram.

20. A review of COLE's calls from jail revealed that on April 5, 2019, at approximately 2303 hours, COLE called WITNESS 1 from jail and informed her that she needed to get everybody together and "make this shit happen."[3] COLE said he needed WITNESS 1 to come up here [from South Carolina to D.C.] to get his property; he stated, "I need you to get everything, everything, everything." On a recorded call, COLE stated that WITNESS 1 will probably need to get a U-Haul and will need to make a few trips. COLE mentioned on one call, "In my bookbag, I got some gwap (slang term for money), you feel me but that is at, you know that is over there and all that."

21. On April 8, 2019, at approximately 1720 hours, COLE again called WITNESS 1 from jail on a recorded line. WITNESS 1 told COLE that his door was kicked in at this house and that his money was gone. COLE asked about his "toys," and WITNESS 1 replied that they were not in the house anymore. WITNESS 1 stated that the DEFENDANT and COLE's mother were already at the house and packing his stuff. WITNESS 1 told COLE that the girl he has been looking for came over to the house Friday night and was trying to get her stuff back, but the DEFENDANT was there and would not let her in. COLE asked WITNESS 1 to call the DEFENDANT on a three-way phone call but WITNESS 1 had trouble getting her cell phone to make the call.

22. On April 8, 2019, at approximately 1757 hours, COLE called WITNESS 1 from the D.C. Jail on a recorded line and told her to get all his stuff when she arrived at his house. COLE said to leave the furniture but everything else "has got to go," including the stuff from the

---

[3] All calls from COLE to WITNESS 1 from the D.C. Jail are recorded pursuant to the D.C. Jail's standard protocol, according to which inmate are advised via recording at the beginning of the call that the line is recorded.

basement, the televisions, and his "raps."

23. On April 9, 2019, at approximately 1845 hours, COLE called WITNESS 1 from the D.C. Jail and asked if his "stuff" is secure. An unknown male got on the phone and told COLE that everything is gone. WITNESS 1 then asked COLE about the sonogram. COLE initially acted like he did not know anything about the sonogram, but then admitted that one of the girls was pregnant. COLE asked who mentioned the sonogram and WITNESS 1 stated that the DEFENDANT had told her about it. COLE's mother then got on the phone and said the "toys" are not in the house. WITNESS 1 then got back on the phone and COLE told her, "make sure all my shit is out of there."

24. A review by agents of the CEHTTF of a call log between WITNESS 1 and the DEFENDANT revealed that they had phone conversations on April 7, 2019, at 1333 hours, April 8, 2019, at 1124 hours, April 10, 2019, at 1043 hours, April 10, 2019, at 1202 hours, April 10, 2019, at 1217 hours, April 10, 2019, at 2113 hours, April 10, 2019, at 2240 hours, April 10, 2019, at 1102 hours, April 11, 2019, at 0700 hours, and April 11, 2019, at 0727 hours.

25. Based on the foregoing, your affiant requests that the Court issue an arrest warrant for the DEFENDANT for commission of Conspiracy to Obstruct Justice, in violation of 18 U.S.C. Sections 1512(c)(1), (c)(2) and (k); and Obstruction of the Enforcement of Sex Trafficking of Minors, in violation of 18 U.S.C. Section 1591(d).

Respectfully submitted,

_____
Jeremiah Johnson
Detective
Metropolitan Police Department

Subscribed and sworn to before me
on this ___16th ___ day of April, 2019.

_____
DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE