# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | |
| LAWRENCE GAMBLE, | Criminal No. 19-348 (CKK) |
| Defendant. | |

## MOTION TO REOPEN DETENTION HEARING AND FOR RELEASE FROM CUSTODY DUE TO IMMEDIATE THREAT FROM COVID-19 PANDEMIC

The defendant, Lawrence Gamble, hereby moves this Honorable Court to reopen his detention hearing and to release Mr. Gamble from pretrial detention at the D.C. Jail immediately. This Motion is made under the Bail Reform Act, 18 U.S.C. § 3142, as well as the Fifth, Sixth, and Eighth Amendments to the United States Constitution.[1]

**WHEREFORE**, Defendant respectfully requests that the Court enter the attached Proposed Order; and grant such other relief as the Court deems just and proper

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

### INTRODUCTION

Mr. Gamble was arrested on May 17, 2019 and has been detained *pending trial* at D.C. Jail for nearly a year.  This court has reviewed the Magistrate Judge's orders detaining Mr. Gamble and has upheld them.  Those determinations currently are on appeal.

However, crucial new facts have arisen since Mr. Gamble appealed this Court's decisions upholding his detention.  In the last few months, SARS-COV-2, a novel coronavirus causing

---

[1] Counsel for Mr. Gamble conferred with counsel for the United States prior to filing this Motion.  The United States does not consent to Mr. Gamble's release from detention.

COVID-19, has become a global and national health emergency, and one that particularly threatens the life and health of individuals detained in our nation's prisons and jails.  The virus is spreading rapidly and seemingly unchecked through both federal and state prisons and jails. According to news reports, inmates across the country have tested positive and several have died from COVID-19.  At least twelve people inside the D.C. Jail, which is operated by the D.C. Department of Corrections ("DOC"), have tested positive for the disease – only one week after jail officials reported the first case.[2]

Detained individuals are particularly susceptible to COVID-19, largely because prisons and jails are fertile breeding grounds for the virus.  The global medical community and governments worldwide advise that the two most important ways to limit COVID-19's spread are good hygiene and social distance – both of which are nearly impossible at the DC Jail.  The jail is notoriously unhygienic, with little access to soap and water.  Hand-sanitizer, which also can kill the virus, is not available to inmates.  And prisoners have no way to practice "social distancing" or other protective measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection.  Instead, while the rest of the District of Columbia is subject to a stay-at-home order from the Mayor's office enforcing social distancing under threat of jail time,[3] the individuals detained at D.C. Jail are

---

[2] *See* NBC Washington Staff, *DC Department of Corrections Reports 12 in Custody Positive for COVID-19*, NBC Washington (Apr. 1, 2020), https://www.nbcwashington.com/news/dc-department-of-corrections-reports-8-in-custody-positive-for-covid-19/2261454/; Keith L. Alexander, et al., *As Inmates in D.C., Maryland and Virginia Test Positive for the Coronavirus, Jail Officials Scramble to Reduce the Risk*, The Washington Post (Apr. 1, 2020), https://www.washingtonpost.com/local/public-safety/as-inmates-in-dc-maryland-and-virginia-test-positive-for-the-coronavirus-jail-officials-scramble-to-reduce-the-risk/2020/04/01/b0d9cfd8-7363-11ea-85cb-8670579b863d_story.html
[3] Mayor's Order 2020-054, Gov't of D.C. (Mar. 30, 2020), *available at*: https://mayor.dc.gov/release/mayor-bowser-issues-stay-home-order.

forced to put themselves in great danger by sitting in the communal barracks, using the communal bathroom, and eating in the communal cafeteria.

For these reasons, courts across the country, including *in this judicial district*, have acknowledged the dangers that COVID-19 pose to our detention facilities and have started ordering the immediate release of prisoners who are particularly high risk, as well as of individuals who have been detained pretrial.  For example, in this Court, Judge Moss has recently released several defendants in light of the COVID-19 pandemic, including defendants with gun and drug charges. *See* Order, *United States v. McLean*, No. 19-cr-380 (D.D.C. Mar. 28, 2020), ECF No. 21; Min. Order, *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020); Order & Mem. Op., *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 27, 2020), ECF Nos. 35-36.  In several of these cases, Judge Moss has reasoned that releasing individuals due to the threat from COVID-19 rebuts the statutory presumption of dangerousness under the Bail Reform Act and that COVID-19 may tip the scales in favor of release.  In *Jaffee*, he reasoned:

>  [T]he Court is now convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement. All responsible government agencies have advised of the risk of transmission posed by large gatherings, and the Court understands the defendant is housed in a unit with dozens other detained individuals. The risk of the spread of the virus in the jail is palpable, and the risk of overburdening the jail's healthcare resources, and the healthcare resources of the surrounding community is real. On the other hand, if defendant is confined at home and has contact only with his wife, the risk to him (including his heightened risk due to the underlying health condition he disclosed to the Court) and to others will be significantly reduced).

Min. Order, *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020).

This same rationale applies to Mr. Gamble.  He is in greater and greater risk of contracting COVID-19 each day he remains detained in the jail.  There are now at least twelve inmates at D.C. Jail with the virus.  As more inmates get sick, there will be fewer infirmary beds.

When the medical staff gets sick, there will be fewer people to provide care. And when the correctional staff gets sick, there will be fewer officers available to bring sick people to the infirmary, hospital, or even just keep an eye on who is showing signs of illness. The combination of lack of adequate sanitation, close quarters, and limited medical capacity create the perfect COVID-19 storm.

Therefore, just as Judge Moss reasoned, the threat from COVID-19 tips the scales in favor of Mr. Gamble's release.  This is particularly so given that Mr. Gamble has not been charged with any violent act, nor does he have any history of violence.  Rather, Mr. Gamble has been charged in a three-count indictment with one count of conspiracy to commit obstruction of justice, 18 U.S.C. §§ 1512(c)(1), (c)(2) & (k); obstruction of justice, 18 U.S.C. §§ 1512 (c)(1) & (c)(2); and obstruction of enforcement of 18 U.S.C. § 1591, 18 U.S.C. § 1591(d), with no allegations that he engaged in any threats, violence, or witness tampering.  ECF No. 17.  And, this Court has previously acknowledged that Mr. Gamble is not a flight risk (*see, e.g.*, Mem. Op. 4-5, ECF No. 25) – indeed, Mr. Gamble has a stable home to return to where his fiancé and children currently reside.   Release from custody will also permit Mr. Gamble to meaningfully communicate with counsel who have been unable to visit in-person and unable to contact him by telephone.  Thus, for all of these reasons, Mr. Gamble respectfully requests release from detention on an immediate and urgent basis.

## BACKGROUND

A.   **Threats Presented by the COVID-19 Pandemic and (Lack of) the Management of the COVID-19 Outbreak at DC Jail.**

As of April 2, 2020, COVID-19 has infected over one million people worldwide and 245,070 in the United States, and killed approximately 53,030 people worldwide and at least

5,949 in the United States.[4]  In the Washington, DC region, Washington, DC reported 657 cases

with 12 deaths as of April 2, while Maryland reports 2,332 cases and 36 deaths, and Virginia

reports 1,708 cases and 42 deaths.[5]  More confirmed cases will surely follow in this region,

across the country, and across the globe.

The coronavirus that causes COVID-19 spreads rapidly and stealthily.  According to the

World Health Organization and as shown in the epidemic curve below, the virus is spreading at a

rapidly accelerating rate.

**Figure 1. Epidemic curve of confirmed COVID-19, by date of report and WHO region through 29 March 2020**



This is of particular concern because COVID-19 is an extremely dangerous disease.  Its overall

fatality rate is between 5 and 35 times greater than the fatality rate associated with seasonal

---

[4] *See* Johns Hopkins University Coronavirus Resource Center, *COVID-19 Global Cases*,
*available at*:  https://coronavirus.jhu.edu/map.html (tracking COVID-19 cases by jurisdiction on
a daily basis).
[5] Antonio Olivo, et al., *Federal Government Gave D.C. a Fraction of What it Sought to Fight
Coronavirus*, The Washington Post (Apr. 2, 2020), https://www.washingtonpost.com/local/dc-
maryland-virginia-shortchanged-by-federal-coronavirus-stockpile/2020/04/02/10df0860-748d-
11ea-87da-77a8136c1a6d_story.html.

influenza and, in the United States, the fatality rate for patients who contract COVID-19 is presently approximately 2.5 percent.[6]  Fatality rates vary wildly, however, depending on both environmental and demographic risk factors – thus, the death rate for those deemed "at risk" is even higher.  While the death rate from COVID-19 increases rapidly with age, the disease also kills individuals with certain preexisting conditions, including cardiovascular disease (13.2%), diabetes (9.2%), hypertension (8.4%), chronic respiratory disease (8%), and cancer (7.6%) at higher rates than the average population.[7]

By all accounts, the COVID-19 pandemic is a national and global crisis.  Indeed, the President has issued a Presidential Proclamation declaring a national emergency[8] and Mayor Muriel Bowser has issued several orders declaring and extending a Public Health Emergency in the District of Columbia, shuttering all non-essential businesses, and requiring residents to stay at home other than for essential, life sustaining activities.[9]  The Mayor's Public Health Emergency Order identified COVID-19 as an imminent threat to the health, safety and welfare of D.C. residents, requiring the D.C. Government to take emergency protective actions.

---

[6] *See COVID-19 Global Cases*, *available at*:  https://coronavirus.jhu.edu/map.html; Decl. of Chris Beyrer, MD, MPH ¶ 5, DATE ("Beyrer Decl."), attached hereto as Exhibit 1.  *See also* Nick Wilson, et al., *Case-Fatality Risk Estimates for COVID-19 Calculated by Using a Lag Time for Fatality*, 26(6) EID Journal (prepublication June 2020), https://wwwnc.cdc.gov/eid/article/26/6/20-0320_article.

[7] *See* World Health Organization, Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19) at 12 (Feb. 16-24, 2020) ("WHO Report"), *available at*: https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf.

[8] *See* Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, The White House (Mar. 13, 2020), *available at*: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

[9] *See, e.g.*, Mayor's Order 2020-046, D.C. Gov't (March 11, 2020); Mayor's Order 2020-053, D.C. Gov't (March 24, 2020); Mayor's Order 2020-054, Gov't of D.C. (Mar. 30, 2020).

For the reasons that follow, the COVID-19 pandemic proposes an even greater and imminent risk to individuals detained in prisons and jails and the D.C. Jail is particularly ill-equipped to manage the spread of the virus through its population.

1. **The COVID-19 Pandemic Poses an Imminent Threat to Individuals Detained in Prisons and Jails.**

Incarceration poses a grave public health threat during this crisis. Much like cruise ships and nursing homes, prisons and jails are extremely dangerous in a pandemic, given the impossibility of social distancing in a confined space.[10] Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[11]

Conditions of pretrial confinement create the ideal environment for the transmission of a highly contagious disease like COVID-19. Jails are notoriously unhygienic, with little access to soap and water and hand-sanitizer is contraband due to its alcohol content. Prisoners cannot take any of the protective measures that have been mandated by health officials throughout the nation; rather, detainees cycle in and out of pretrial facilities on a daily basis, and jail employees rotate, coming and going without screening. All of these individuals potentially can carry the virus from the facility to their homes and communities, and then return back, bringing new

---

[10] *See* Dr. Jeffrey Keller, *COVID-19 in Jails? It Might Get Ugly*, Medpage Today, (Mar. 12, 2020), https://www.medpagetoday.com/blogs/doing-time/85366; Dr. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, The New York Times (March 16, 2020), https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.amp.html.

[11] *See, e.g.*, Laura M. Maruschak et al., *Pandemic Influenza and Jail Facilities and Populations*, 99 Am. J. Pub. Health Supp. 2 (2009) (urging, in regard to the flu, that "During a pandemic, jail medical services will likely be insufficient to treat large numbers of sick inmates; further, local hospitals may be overburdened and unable to admit inmates who are seriously ill with influenza").

germs with them.  Thus, outbreaks of diseases like COVID-19 spread rapidly through jails and also lead to increased spread outside of the jails.[12]

In addition, there are two very recent, and very troubling, developments relating to COVID-19 that exacerbate the disease's potential impact on the D.C. Jail.  First, on April 1, 2020, the National Academy of Sciences sent a letter to the White House indicating that research suggests the Coronavirus may be spread through aerosolization – *e.g.*, simply by exhaling or talking in close quarters.[13]  This has dire consequences for the population at the jail, where everyone is so close to each other.  Second, data from the state of Michigan shows that the virus may have a disproportionate impact on black people.  It has been reported that "[a]t least 40% of those killed by the novel coronavirus in Michigan so far are black, a percentage that far exceeds the proportion of African Americans in the . . . state."[14]  That is very troubling news for the D.C. Jail and for Mr. Gamble (as he is already high risk due to hypertension, *see infra*).

"It is therefore an ***urgent priority*** in this time of national public health emergency to reduce the number of persons in detention as quickly as possible."[15]

### 2.     At Least 12 Inmates at DC Jail Have Tested Positive for COVID-19 and the DC Jail is Not Equipped to Prevent a Deadly Outbreak.

As the Court is aware, COVID-19 has entered D.C. Jail.  To date, at least twelve people have tested positive, and others are awaiting test results.  This is the case even though just over a

---

[12] *See* Beyrer Decl. ¶¶ 11-15.

[13] *See* Elizabeth Cohen, *Experts Tell White House Coronavirus Can Spread through Talking or Even Just Breathing*, CNN.com (Apr. 2, 2020), https://www.cnn.com/2020/04/02/health/aerosol-coronavirus-spread-white-house-letter/index.html.

[14] Craig Mauger & Christine MacDonald, *Michigan's COVID-19 Cases, Deaths Hit Blacks Disproportionately*, The Detroit News (Apr. 2, 2020), https://www.detroitnews.com/story/news/local/michigan/2020/04/02/michigans-covid-19-deaths-hit-417-cases-exceed-10-700/5113221002/.

[15] Beyrer Decl. ¶ 17 (emphasis added).

week ago, the DOC reported that there were no known positive tests by inmates.[16]  Thus, the disease is starting to spread.

The DC Jail is ill-equipped to prevent a wide-spread outbreak of COVID-19.  First, the DOC has not banned visits by attorneys and other legal team members, all of whom may transmit COVID-19 just as easily as members of the general public. Second, the DOC has implemented a screening process for those entering the facility that is comprised of a visual inspection to determine whether the person entering the facility looks sick and a body temperature check to determine if the person has a fever.  While this process theoretically is better than *nothing*, it wholly fails to account for the fact people can be asymptomatic carriers of COVID-19.  Third, the DC Jail is overcrowded, unsafe, unsanitary, and out of compliance with Department of Health regulations on a normal day, notwithstanding the current pandemic.[17]  Fourth, the DOC's ventilation system has been repeatedly cited as not in compliance with acceptable standards.[18]  Finally, and perhaps most importantly, the DOC has already failed to quarantine and care for inmates effectively, as at least twelve inmates have tested positive within the last week.

These conclusions are supported by law enforcement, particularly given that corrections officers also have tested positive for COVID-19.  On March 20, 2020, the union representing correctional officers unanimously voted "no confidence" in DOC's ability to handle COVID-

---

[16] *See* Alexander, *supra*.
[17] *See* Office of the D.C. Auditor, *Poor Conditions Persist at Aging D.C. Jail; New Facility Needed to Mitigate Risks* at 3, 7 (Feb. 28, 2019) ("2019 DOC Audit Report"), http://dcauditor.org/report/poor-conditions-persist-at-aging-d-c-jail-new-facility-needed-to-mitigate-risks/.
[18] *Id.* at 7.

19.[19]  Similarly, on March 29, 2020, the Fraternal Order of the Police Labor Committee for the

DOC issued a press release[20] that scathingly rebukes the DC Jail's preparedness for this crisis:

> Our conclusion is two-fold: (1) the City does not have the resources to combat
> COVID-19, and the Jail is the lowest priority among the health and safety
> community; and (2) the City wants to keep the truth from the public.  The mayor
> said as much at a recent press conference when she announced that corrections
> officers will not be provided with protective equipment because the officers do not
> provide medical care. . . . DOC is not following the 'Guidance on Management of
> COVID-19 at Correctional and Detention Facilities,' issued and updated regularly
> by the Center for Control Disease. . . . Cleaning and disinfection of the Housing
> Units is inadequately performed by inmates, and the Department of Health has not
> conducted inspections of the Housing Units to our knowledge. . . DOC misleads
> the public in its reporting of positive cases of COVID-19 among inmates.  Testing
> is inadequate at the D.C. Jail.  Inmates are only tested when it is too late to protect
> other inmates, and the results take almost six hours.

For all of these reasons, the DC Jail is entirely ill-equipped to handle COVID-19 and the

ramifications for both the incarcerated population and correctional staff will soon be dire.

**B.      Mr. Gamble Has a Heightened Risk of Contracting COVID-19.**

Mr. Gamble suffers from hypertension, a known co-morbidity with COVID-19.[21]

Although Mr. Gamble takes medication for this condition, medical studies have shown that

individuals with hypertension remain at increased risk of contracting COVID-19 even when they

are actively managing the hypertension.[22]  Therefore, Mr. Gamble is "high risk" and is more

likely to contract COVID-19 than the average person.

---

[19] Sophie Kaplan, *Union votes 'no confidence' in D.C. Jail leaders for handling of COVID-19*,
The Washington Times (Mar. 20, 2020),
https://www.washingtontimes.com/news/2020/mar/20/union-votes-no-confidence-dc-jail-leaders-handling/.
[20] *See* Press Release, Fraternal Order of Police, Department of Corrections Labor Committee
(Mar. 29, 2020), *available at*:
https://www.fd.org/sites/default/files/covid19/bop_jail_policies_and_information/fop_press_release_1.pdf.
[21] *See* WHO Report *supra*.
[22] *Id.  See also, e.g.*, Lei Fang, et al., *Are Patients with Hypertension and Diabetes Mellitus at
Increased Risk for COVID-19 Infection?*, The Lancet (Mar. 11, 2020),
https://www.thelancet.com/journals/lanres/article/PIIS2213-2600(20)30116-8/fulltext.

C.      **Mr. Gamble's Case Status and Lack of Access to Counsel.**

Mr. Gamble is charged with conspiracy to obstruct justice, obstruction of justice, and obstruction of enforcement of 18 U.S.C. § 1591.  He has filed several motions seeking revocation of his pretrial detention order.  *See* ECF Nos. 21, 28.  The Court has denied those motions, finding that the weight of the evidence did not support revocation of pretrial detention and that Mr. Gamble was likely to obstruct justice again if released.  *See, e.g.*, ECF No. 35.  *See also* ECF Nos. 24-25, 34.  Mr. Gamble has taken an appeal from these denials to the D.C. Circuit.  ECF No. 38.  Briefing is complete in the appellate court, but the court has yet to rule.

Simultaneously, the pretrial schedule for Mr. Gamble case was just recently delayed by the Court in response to the Court's general orders concerning COVID-19.  On March 30, 2020, the Court held a status conference and set new pretrial deadlines for Mr. Gamble's case.  The new scheduling order has deadlines into June and does not include a trial date.  ECF No. 51.  Mr. Gamble's trial date likely will be even further delayed even once the proceedings are "back on track" because undersigned counsel is not presently able to prepare a defense without the ability to interview witnesses or conduct a proper investigation.  Thus, Mr. Gamble currently has no trial date and no end to his detention in sight.

In addition, undersigned counsel advised the Court during the March 30 status conference that we have been unable to communicate with Mr. Gamble.  D.C. Jail personnel do not answer the phone or return voicemail requests to speak with detained clients.  Instead, undersigned counsel and other defense attorneys have been told to personally visit clients at the D.C. Jail – a patently unacceptable option and one that would put their health and the health of inmates at risk.

This situation also has prevented undersigned counsel from discussing with Mr. Gamble a potential resolution of this case.  The government sent a tentative plea offer to Mr. Gamble that

might well result in his being sentenced to the time he has already served in pretrial custody. Yet, counsel have been unable to discuss it with Mr. Gamble.

## ARGUMENT

"In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  For the reasons that follow, Mr. Gamble's detention no longer is justified.

### A.   The Bail Reform Act Authorizes the Court to Release Mr. Gamble for COVID-19-Related Reasons.

Earlier on in this case, the magistrate judge ordered Mr. Gamble detained. Since that time, circumstances have radically changed.  Considering the COVID-19 pandemic and the impending outbreak in the D.C. Jail, the factors set forth in 18 U.S.C. § 3142(g) counsel in favor of releasing Mr. Gamble from the D.C. Jail because continued incarceration poses a grave danger to both Mr. Gamble and the community.

There is no greater necessity than keeping Mr. Gamble alive.  In many cases, federal courts have released detained individuals for health-related reasons and have carefully tailored the conditions of release based on the crimes with which those individuals have been charged. *See, e.g.*, *United States v. Johnston*, Mag. No. 17-00046, 2017 WL 4277140 (D.D.C. Sept. 27, 2017) (defendant charged with Mann Act violation and in need of colon surgery released to custody of his wife for 21 days); *United States v. Adams*, No. 6:19-mj-00087, 2019 WL 3037042 (D. Or. July 10, 2019) (defendant charged with Mann Act violation and possession of child pornography released on home detention because of diabetes, heart conditions and open sores); *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143 (D.P.R. 2002) (badly wounded defendant released to custody of his relatives); *United States v. Scarpa*, 815 F. Supp. 88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because

of the "unacceptably high risk of infection and death on a daily basis inside the MCC"). The threat of COVID-19 requires the same result, as several judges in this Court have already recognized. *See supra* Introduction (citing cases in which individuals detained at D.C. Jail have been released due to the threat of COVID-19). And, in Mr. Gamble's case, release is particularly imperative because his hypertension, and potentially his race, render him at a higher risk of contracting the disease.

Mr. Gamble's continued detention also poses a grave risk to the community. The more people that remain detained in detention facilities and jails, the greater the likelihood of an unchecked outbreak of COVID-19 within those institutions. *See* Beyrer Decl. ¶¶ 11-19. Such an outbreak will impact inmates, correctional officers, and the communities of which those inmates and officers are a part.

Finally, Mr. Gamble's continued detention runs counter to public policy. Despite the Bail Reform Act's promise, defendants are subjected to pretrial detention at an extremely high rate. Indeed, *Salerno* advises that release should be the "norm," yet federal district courts routinely detain defendants more often than they release them, notwithstanding that the vast majority of the defendants appear for court hearings.[23] Like so much else that has had to change so quickly during the COVID-19 pandemic, public health demands a change to this trend. Incarceration poses a grave public threat and public policy would favor accepting the minimal risks presented by pretrial release in order to protect defendants – particularly those who *have not been convicted of a crime* – and communities from the dangers posed by concentrated

---

[23] *See, e.g.*, U.S. Dep't of Justice, Office of Justice Programs, *Pretrial Detention and Misconduct in Federal District Courts, 1995-2010* (2013), https://www.bjs.gov/content/pub/pdf/pdmfdc9510.pdf.

populations and community spread.  In more grave terms, many people may die needlessly if

detention practices are not adjusted.

**B.      Immediate Release from Custody Is Needed to Protect Mr. Gamble's Constitutional Rights.**

        **1.      <u>Continued Detention in the Face of the COVID-19 Outbreak at D.C. Jail Will Violate Mr. Gamble's Fifth Amendment Due Process Rights</u>.**

        The Fifth Amendment Due Process Clause compels the Court to protect Mr. Gamble

from punitive conditions of confinement and ensure that he is afforded adequate medical care.  A

pretrial detainee's freedom from pretrial confinement is a fundamental right protected by the Due

Process Clause and any government action infringing on that right must be narrowly tailored to

achieve a compelling government interest.  *Salerno*, 481 U.S. at 753-54; *see also Bell v. Wolfish*,

441 U.S. 520, 535 (1979).

        Although the Government has an interest in detaining a defendant to secure his

appearance at trial, the Government may only subject a detainee "to the restrictions and

conditions of the detention facility so long as those conditions and restrictions do not amount to

punishment, or otherwise violate the Constitution."  *Bell*, 441 U.S. at 536–37.  "[I]f the condition

of confinement being challenged is not reasonably related to a legitimate goal – if it is arbitrary

or purposeless – a court permissibly may infer that the purpose of the governmental action is

punishment."  *Kingsley v. Hendrickson*, 576 U.S. 389 (2015) (internal quotation marks omitted).

S*ee also Doe v. Kelly*, 878 F.3d 710 (9th Cir. 2017) (noting that a particular restriction or

condition is punishment if the "restriction or condition is not reasonably related to a legitimate

governmental objective or is excessive in relation to the legitimate governmental objective")

(citation omitted).

        Pretrial detainees also have a substantive due process interest in freedom from deliberate

indifference to their medical needs.  *See Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir.

2018) (en banc).  In *Brown v. Plata*, the Supreme Court explained that a prisoner "may suffer or die if not provided adequate medical care.  A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."  563 U.S. 493, 510–11 (2011).  While prisoner claims in *Brown v. Plata* arose under the Eighth Amendment, pretrial detainees likewise have the legal right to adequate medical care, given that their rights are at least as great as, if not greater than, those of convicted persons being punished by imprisonment.

Mr. Gamble is entitled to the protections that must be afforded to pretrial detainees:  he has not yet received a sentence or final judgement; nor does he even have a trial date given the uncertainty of the Court's schedule due to the COVID-19 pandemic.  The current conditions of confinement create an unreasonable risk of exposure to COVID-19 and do not provide the necessary supplies for personal and environmental hygiene necessary to protect against contraction of the virus.  In light of the extreme risk to Mr. Gamble's health posed by the virus and the ever-increasing likelihood that he will contract it if he remains housed under current conditions, the conditions of his confinement are punitive and violative of the Fifth Amendment.  Accordingly, Mr. Gamble requests that the Court issue an order releasing him from detention to ensure his constitutional rights are protected and is life is not jeopardized during this crisis.

2. **Continued Detention in the Face of the COVID-19 Outbreak at D.C. Jail Is Depriving and Will Continue to Deprive Mr. Gamble of His Sixth Amendment Right to Counsel.**

The Sixth Amendment to the U.S. Constitution provides that individuals accused of crimes shall have the assistance of counsel for their defense.  "[T]he right to counsel is the right to effective assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quotation omitted).  The "[g]overment violates the right to effective assistance when it interferes . . . with the ability of counsel to make independent decisions about how to conduct the defense"

and defense counsel may "deprive a defendant of the right to effective assistance . . . by failing to render 'adequate legal assistance.'" *Id.* (citations omitted). In *Missouri v. Frye*, the Supreme Court held that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." 566 U.S. 134, 145 (2012). The Court further held that defense counsel fails to render effective assistance if he allows a plea offer to expire without advising the defendant or allowing him to consider it. *Id.*

Here, the COVID-19 outbreak at D.C. Jail and DOC's response thereto are preventing Mr. Gamble from receiving effective assistance of counsel. Counsel are unable to communicate with Mr. Gamble, unless they visit in person, a dangerous endeavor at best. Otherwise, the jail has a policy whereby lawyers can call designated individuals at the jail and request a legal phone call with their client. Lawyers are then instructed to submit an email request, which results in the receipt of a reply email stating that "there will be a delay in processing legal calls," and that the lawyer will be contacted again by email. (But, of course, that does not happen). In Mr. Gamble's case, counsel attempted several times to follow the procedures and contact the designated individuals at the jail; however, no one ever returned the calls and counsel was not prompted to send an email.

Thus, counsel are being forced to be ineffective as a result of Mr. Gamble's detention and Mr. Gamble's Sixth Amendment rights are being infringed upon. Moreover, the D.C. Jail's failure to provide Mr. Gamble access to counsel violates Magistrate Judge Harvey's detention order, which stated that Mr. Gamble "must be afforded reasonable opportunity for private consultation with defense counsel." Detention Mem. 12, ECF No. 7. Indeed, it is possible that the case could have been resolved by now had Mr. Gamble been released.

**3.      Continued Detention in the Face of the COVID-19 Outbreak at D.C. Jail Will Violate Mr. Gamble's Eighth Amendment Protections.**

The Eighth Amendment's prohibition against cruel and unusual punishment also compels release under the current extraordinary circumstances.  The government, in detaining defendants pretrial, must take sufficient protective measures to prevent contraction of COVID-19 in the jail population.

Unreasonable risk of COVID-19 contraction is, in itself, unconstitutional.  The Supreme Court has held that exposure to environmental threats to an incarcerated person's physical wellbeing where exposure is preventable could constitute an Eighth Amendment violation.  *See Helling v. McKinney*, 509 U.S. 25, 28-30 (1993) (exposure to substantial volume of tobacco smoke was appropriate basis for Eighth Amendment claim).  In *Helling*, a case involving a claim relating to exposure to environmental tobacco smoke ("ETS") from a cellmate's 5-pack a day smoking habit, the Supreme Court found that the plaintiff stated "a cause of action under the Eighth Amendment by alleging that petitioners have, with deliberate indifference, exposed him to levels of ETS that pose an unreasonable risk of serious damage to his future health."  *Id.* at 35.  Other courts have recognized that *Helling*'s application goes beyond tobacco smoke, reaching "other situations in which environmental factors can pose an unreasonable risk to an inmate's health, including exposure to 'infectious maladies such as hepatitis and venereal disease' caused by overcrowding, unsafe drinking water, and 'toxic or other substances."  *Allen v. Kramer*, No. 1:15-cv-1609, 2016 WL 4613360, at *7 (E.D. Cal. Aug. 17, 2016) (discussed *infra*; release from detention due to Valley Fever).  *See also cases cited in Allen*:  *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. 2004) (contagious disease (meningitis) caused by overcrowding conditions); *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001) (contaminated drinking water); *Crawford v. Coughlin*, 43 F. Supp. 2d 319, 325 (W.D.N.Y. 1999) (exposure to

paint toxins); *Wallis v. Baldwin*, 70 F.3d 1074, 1076-77 (9th Cir. 1995) (asbestos exposure); *Masonoff v. DuBois*, 899 F. Supp. 782, 797 (D. Mass. 1995) (compelled use of chemical toilets).

Perhaps most applicable to COVID-19, the court in *Allen v. Kramer* and several other courts applied *Helling* to the exposure of inmates to Valley Fever in California. Relying on *Helling*, the *Allen* court concluded that an inmate had alleged an Eighth Amendment violation because he was housed in the Central Valley of California where there was a relatively high risk of contracting an illness known as Valley Fever. 2016 WL 4613360, at *1, 11. This rationale was adopted in two other cases: *Shabazz v. Beard*, No. 1:15-cv-881, 2018 WL 1071173, at *7-9 (E.D. Cal. Feb. 27, 2018) (subsequent history omitted) and *Jackson v. California*, No. 1:13-cv-1055, 2014 WL 670104, at *5 (E.D. Cal. Feb. 20, 2014) (subsequent history omitted).

Exposure to COVID-19 is no different from, and likely far more severe than, these other environmental risks. And the DOC and D.C. Jail personnel are acting with deliberate indifference. Mr. Gamble is housed at a facility that is unable to adequately protect him from contracting the virus, and more importantly, places him at a heightened risk of exposure due to the environmental conditions – which is particularly problematic given that he is already "high risk" due to his preexisting hypertension and because he is black. Because the DOC clearly is failing to protect inmates from the risk of contracting COVID-19, Mr. Gamble's continued detention violates his rights under the Eighth Amendment. Accordingly, Mr. Gamble requests immediate release from pretrial detention.

4.    **The Court Has the Power to Order Appropriate Supervision of Mr. Gamble to Counteract any Purported Danger that He Poses to the Community and any Purported Possibility that Mr. Gamble Would Engage in Criminal Activity.**

As noted above, the Court has, to-date, found that Mr. Gamble should be detained pending trial. Mr. Gamble reiterates all of his objections to these findings previously raised with

this Court (and the D.C. Circuit) and further contends that the risk that he will contract COVID-19 in the D.C. Jail far outweighs the (*minimal*) risk that Mr. Gamble poses to the community or that he will engage in any obstructive activity if released.  This is particularly so given that Mr. Gamble would be released to him home in Baltimore, Maryland, the residents of which are subject to a strict stay-at-home order issued by Maryland Governor Hogan.[24]

To the extent the Court still has concerns about Mr. Gamble's release, the Court should release Mr. Gamble from DOC custody with the condition that he be under home detention and subject to supervision by Pretrial Services.  Although Mr. Gamble maintains that such strict conditions of release are not necessary, immediate release with supervision is preferable to contracting COVID-19.  Indeed, Mr. Gamble's primary goal in seeking emergency relief is to stay healthy.

## CONCLUSION

For the foregoing reasons, Mr. Gamble respectfully requests that this Court grant the Emergency Motion and issue an order releasing Mr. Gamble from the custody of the D.C. Department of Corrections on an emergency basis and with conditions determined by D.C. Pretrial Services.  Immediate release from detention will protect Mr. Gamble's health and ensure that his constitutional rights are respected.

Dated:  April 3, 2020                            Respectfully submitted,


/s/ Kierstan L. Carlson
Kierstan L. Carlson
BLANK ROME LLP
1825 Eye Street, N.W.
Washington, DC  20006-5403
Tel:  (202) 420-2200

---

[24] *See* Order of the Governor of the State of Maryland No. 20-03-30-01, *available at*: https://governor.maryland.gov/wp-content/uploads/2020/03/Gatherings-FOURTH-AMENDED-3.30.20.pdf.

Fax: (202) 420-2201
carlson@blankrome.com

A.J. Kramer
FEDERAL PUBLIC DEFENDER
625 Indiana Avenue, N.W.
Suite 550
Washington, DC 20004
Tel:  (202) 208-7500
A._J._Kramer@fd.org

*Counsel for Defendant*

## **CERTIFICATE OF SERVICE**

I, Kierstan L. Carlson, hereby certify that a true and correct copy of the foregoing Motion to Reopen Detention Hearing and for Release from Custody Due to Immediate Threat from COVID-19 Pandemic, and the Memorandum of Points and Authorities in support thereof were filed electronically via the Court's CM/ECF system and served electronically on counsel of record.


Dated:  April 3, 2020

/s/ Kierstan L. Carlson
Kierstan L. Carlson (DC Bar No. 1005383)
**BLANK ROME LLP**
1825 Eye Street, N.W.
Washington, DC  20006-5403
Tel:  (202) 420-2200
Fax: (202) 420-2201
carlson@blankrome.com

*Counsel for Defendant*